### MAHER v. COMPAGNIE GENERALE TRANSATLANTIQUE.

(Supreme Court, Appellate Division, First Department.   December 31, 1913.)

1. TRIAL (§ 337*)—VERDICT—DISREGARD OF INSTRUCTIONS.

   An instruction which eliminates a ground of recovery is the law of the case, and a verdict based on that ground is against the law.

   [Ed. Note.—For other cases, see Trial, Cent. Dig. § 790; Dec. Dig. § 337.*]

2. SHIPPING (§ 86*)—INJURY TO LONGSHOREMAN—NEGLIGENCE—PROXIMATE CAUSE.

   Plaintiff was injured while working as a longshoreman in assisting in loading cotton into a vessel by a draft of cotton swinging over and striking him. He was employed in the capacities of putting on and removing the hook lifting the draft, and in signaling. He went over to speak to a fellow employé about the way in which the man on the deck was slinging the draft, and while there the accident happened. Held, that the fact that he was acting in the two capacities was not the proximate cause of the accident, and there could be no recovery based on the employer's negligent failure to employ an additional man to act in one of such capacities.

   [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 343, 353-360; Dec. Dig. § 86.*]

3. SHIPPING (§ 84*)—INJURY TO LONGSHOREMAN—CONTRIBUTORY NEGLIGENCE.

   Where plaintiff, assisting as a longshoreman in loading cotton into a vessel, knew that a draft of cotton was swinging over, but failed to watch out for and avoid it, and was struck and injured, he was as a matter of law guilty of contributory negligence.

   [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 342, 349-351; Dec. Dig. § 84.*]

Appeal from Trial Term, New York County.

Action by John C. Maher, by his guardian ad litem, Ellen Gleason, against the Compagnie Generale Transatlantique. From a judgment for plaintiff and from an order denying a new trial, defendant appeals. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, DOWLING, and HOTCHKISS, JJ.

Nolan Brothers, of New York City (Joseph P. Nolan, of New York City, of counsel), for appellant.

Richard J. Donovan, of New York City (Herbert D. Cohen, of New York City, on the brief), for respondent.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

CLARKE, J. Plaintiff was injured while working for defendant as a longshoreman on December 22, 1911. He was then two days less than 19 years old and had been employed by various steamship companies during the year previous. He was a rigger, deckman, or sailor. The longshoreman works by the hour. He watches for ships to come in and moves from ship to ship, from one steamship line to another. The men are picked at the gate and know where to go without being told. The boss stevedore hired plaintiff on the noon previous to his injury. The method is that the stevedore goes to the gate of the dock and blows a whistle. The sailors, riggers, and dockmen get in line, and the first man picked acts as gangwayman or takes the hatch, and the others take their places according to custom. The gangwayman gets five cents more than the others. The sailors or riggers do hooking up, passing the word, turning on steam, running the winch, or act as gangwaymen. "Hooking up" is putting on the hook that lifts the draft and removing the hook. "Passing the word" is signaling by word of mouth or by hand when everything is clear for receiving the draft on the ship. "Running the winch" is doing by machinery what a person running a derrick by hand would do, turning a crank so that the lifting rope winds round a drum or spool. "Turning on steam" is letting steam run into the winch. "Acting as gangwayman" is standing over the hatch, looking into the hold to see that all is clear for the draft, and giving the word to the assistant gangwayman or passing the word man to bring in the draft. When the general foreman or assistant foreman directs, the gangwayman changes the place of loading, and, incidentally, adjusts the guys and the rigging to the new conditions with the assistance of the men of the gang.

On the day of Maher's accident, cotton was being loaded into the steamship Rochambeau. She was a new ship carrying only one class of passengers. She had four hatches. Maher was working forward of the bridge at No. 3 hatch. She was moored at the time on the south side of pier 57 North River, her bow inshore. He was working at the port or inshore side of the ship. She was breasted off from the dock; coal boats being alongside. Her deck was about 25 feet above the floor of the dock from which cotton was being swung up. On the dock was a derrick run by electricity and operated by Weldon. To this winch was attached what is called the Burton fall. The hook known as the Burton hook at the end of the Burton fall would be attached to a draft of cotton, and the cotton would be swung up across the deck, a distance of 18 or 20 feet and suspended over the hatch while Maher took off the Burton hook. At this time the up and down fall, operated by the winch on the deck by Hansen, received the weight of the draft and lowered the cotton into the hold.

Maher's duty, as pass the word man, was to stand at the rail near the dock and signal to Weldon, the man at the winch on the dock which operated the Burton fall. As soon as Weldon started his winch, Maher would give the signal to Hansen, the winchman on the ship, to go ahead, as both the Burton fall and the up and down fall, which was attached to a boom and ran down alongside the boom through a pulley at the base thereof to the winch on deck, were attached to each draft.

Each winchman had to take in the slack of his line when the other fall was bearing the weight of the draft. When the draft got up over the rail of the ship, the up and down fall, attached to the deck winch, drew it over to the hatch and held it suspended. Maher's duty was to watch the draft go over to the hatch opening and then to signal to slack away with the Burton fall, then, as hooker on, unhook the Burton fall from the draft so that its weight would rest on the up and down fall. He testified:

"When the draft got the height of the rail, there was no need of me standing there, because I would be knocked down with the draft. I started for the hatch, watching the draft coming in. * * * When it got as far as the guy (alluding to a guy from the end of the boom which was made fast to a ventilator on the deck), the corner struck the guy and came back and came away over here and struck me. That draft of cotton swung over to strike me about five or six feet toward me. It was swung aft. * * * That is away from the boom. It swung away from the head of the boom. It came in half a circle. It came out toward the rail of the ship a little. It came out towards the rail of the ship first and swung around behind my back. It hit me right in the left shoulder; hit me full on the shoulder. The whole thing happened so quick I could not get out of the way; I had my shoulder to it. As I walked over, I was looking at the draft and looking at the gangwayman, and I told him to go out and give the man swinging up the cotton a call for not slinging up the cotton properly. Q. That was what you were going over to say to Albert Nelson? A. And I was looking at the draft at the same time coming in. I was looking at the draft and talking to Albert at one time. The man that I wanted my own boss to give instructions to was some dockman. I do not know who he was. He was sending it in, but he was not slinging it up right. If I unhooked a draft there, if it was not slung up right, it would drop down and kill a couple of men in the hold."

[1] In his notice of injury, he states that he was "informed that the cotton was caused to swing out of the usual course by striking a guy rope." At the trial he swore that he saw the draft hit the guy. Conway, his eyewitness, testified:

"Maher was, from the combings of the hatch when the cotton hit it, about a couple of feet. * * * I saw it going to hit the guy rope. I hollered to him across the hatch, to both men. Hollered to get out of the road. He was facing me, and he had his back to the draft. * * * He thought he was out of the way. He was standing there, waiting for the draft to come in; standing perfectly still. He was not talking to anybody as I know of. Q. Did you hear him say yesterday he was talking to Albert Nelson? A. I could not hear that across the hatch."

Defendant's two eyewitnesses testified that Maher had his back to the draft and was not looking at it.

The particular negligence complained of was in attaching the guy in an improper and dangerous place, in view of the fact that the cotton was coming in on an angle, in not having ring bolts in the deck to which the guy could be attached in proper places, therefore compelling it to be made fast to the ventilator, and in not furnishing a sufficient number of men; the claim being that instead of five men in this gang there should have been six. As there were only five men, the plaintiff was compelled to do the work of two men, to wit, that of a signal passer and a hooker on.

During the charge Mr. Nolan (for the defendant):

"I ask your honor to charge the jury that they are instructed that the fastening and placing of the guy rope was a detail of the work for the placing of which the defendant itself was not liable.

"The Court: The fastening and placing of the guy upon the ventilator was a detail of the work for the placing of which the defendant itself was not liable. I will charge it."

That, then, was the law of the case. If so, negligence could not be predicated upon the position of the guy. A verdict based upon such negligence would be against the law as charged.

[2] Nor can actionable negligence be found from the fact that five men were in the gang instead of six. Five only were frequently employed, and witnesses testified they had served as "hooker on" and "pass the word man" at the same time. The fact that Maher was so acting was not the proximate cause of the accident. The plaintiff testified that he went over to speak to Nelson about the way in which the man on the dock was slinging the draft, so, according to his testimony, he would have put himself in the same place he was in at the time of the accident whether he had any duty as hooker on or not. It seems to me that, with negligence based upon the placing of the guy eliminated, there is no basis for this judgment.

[3] The accident was apparently caused by plaintiff's own negligence. He knew this draft was swinging over. He should have watched out for and avoided it. Having failed to prove negligence on the defendant's part, the verdict should not stand.

The judgment and order appealed from should be reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur.

---

### In re RASQUIN et al.

(Supreme Court, Appellate Division, First Department. December 31, 1913.)

CHARITIES (§ 21*)—CHARITABLE BEQUESTS—UNCERTAINTY OF BENEFICIARIES.

Under Act 1893, now Personal Property Law (Consol. Laws 1909, c. 41) § 12, providing that no bequests for charitable or benevolent purposes shall be deemed invalid by reason of indefiniteness or uncertainty of the designated beneficiaries, a bequest to "the poor of" a certain town is valid.

[Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 44–50; Dec. Dig. § 21.*]

Appeal from Surrogate's Court, New York County.